UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NEXUS NANO ELECTRONICS, INC. AND NEXUS CUSTOM ELECTRONICS, CORP.,<br><br>Plaintiffs<br><br>v.<br><br>JACO ELECTRONICS, INC. AND NEXUS CUSTOM ELECTRONICS, INC.,<br><br>Defendants | 06 CV 6687<br><br>Case No.   JUDGE HOLWELL<br><br><br>RECEIVED<br>SEP 0 1 2006<br>U.S.D.C. S.D. N.Y.<br>CASHIERS<br><br>ECF CASE |

## COMPLAINT

Plaintiffs Nexus Nano Electronics, Inc., successor in interest to Sagamore Holdings, Inc. ("Sagamore") and Nexus Custom Electronics Corp. ("Nexus"), successor in interest to NECI Acquisition Inc., by and through their attorneys, Dobrowski L.L.P., and Sanford P. Rosen & Associates, P.C., for their complaint state as follows:

### PARTIES

1. Plaintiff Nexus Nano Electronics, Inc. ("Nexus Nano"), is a corporation organized under the laws of the State of Nevada with its principal place of business at 402 Prospect Street, Brandon, Vermont 05733. Nexus Nano is the successor in interest to Sagamore Holdings, Inc.

2. Plaintiff Nexus Custom Electronics Corp. ("Nexus Custom"), is a corporation organized under the laws of the state of Florida with its principal place of business at 402 Prospect Street, Brandon, Vermont 05733. Nexus Custom is the successor in interest to NECI Acquisition Inc., and is a wholly owned subsidiary of Nexus Nano.

3. Defendant Jaco Electronics, Inc., ("Jaco") is a corporation organized under the laws of the state of New York with its principal place of business at 145 Oser Avenue, Hauppauge, New York 11788.

4. On information and belief, Defendant Nexus Custom Electronics, Inc. ("Jaco-Nexus") is a corporation organized under the laws of the state of Delaware with its principal place of business at 145 Oser Avenue, Hauppauge, New York 11788.

## JURISDICTION AND VENUE

5. This court has jurisdiction pursuant to 28 U.S.C. § 1332(a). Venue is proper in this district pursuant to 28 U.S.C. § 1391(a). The amount in controversy exceeds $75,000.

## FACTS

6. This complaint arises from Defendants' willful and negligent misrepresentations by which they induced Plaintiffs to purchase the assets of Jaco-Nexus by grossly overstating value of the assets and earnings of Jaco-Nexus.

7. On September 20, 2004, Defendants sold to Plaintiffs substantially all the assets of Jaco-Nexus. The terms of this sale are reflected in the Asset Purchase Agreement Among Sagamore Holdings, Inc., NECI Acquisition, Inc., Nexus Custom Electronics, Inc., and Jaco Electronics, Inc., ("Asset Purchase Agreement"), a true and correct copy of which is attached as Exhibit 1. The cash consideration Plaintiffs paid for Jaco-Nexus' assets included a Purchase Price of $12,000,000. Ex. 1 at ¶ 2.9. This purchase price was arrived at in negotiations between the parties and was calculated to reflect a multiple of approximately 6 times Jaco-Nexus' earnings before interest, tax, depreciation, and amortization ("EBITDA") for the fiscal year ending June 30, 2004.

8. At closing, Plaintiffs paid to Jaco $9,250,000 in cash. This cash payment was funded by $5.25 million in proceeds from the sale of Series A preferred stock, a 7% note for $2.75 million to Jaco, and the remainder of the $12 million funded through credit facilities with Comerica bank.

9. Prior to the closing, Defendants repeatedly represented to Plaintiffs that Jaco-Nexus' would achieve an EBITDA for 2004 of approximately $2.2 to $2.3 million, thus justifying the on purchase price. Moreover, Defendants repeated these representations to Plaintiffs bankers, Comerica Bank, in order to induce Comerica to advance the funds necessary to complete the purchase. See Management Presentation, July 2004 (copy attached as Exhibit 2) at p. 50.

10. At the closing, Jaco again purported to justify the purchase price by representing in the Asset Purchase Agreement that Jaco-Nexus had, in fact achieved an EBITDA of $2,376,638 for 2004. Exhibit 1, Asset Purchase Agreement Schedule 3.4. These representations to Plaintiffs and to Plaintiffs' banker were false because Defendants had knowingly carried forward inventory that was obsolete and of no value, without properly writing this inventory off and taking the appropriate charges against Jaco-Nexus' balance sheet.

11. The importance of this failure is clear. Jaco-Nexus' inventory, which Jaco valued at $7.9 million, constituted nearly 60% of its total assets at closing. Ex. 1, Asset Purchase Agreement, Schedule 3.4. A significant reduction in the value of the inventory would have a direct effect on the amount Jaco could demand for the purchase of its subsidiary. Further, any write-off of inventory would ultimately reduce Jaco-Nexus EBIDTA, and, under the formula, would dramatically reduce the purchase price.

12. Defendants failure to write off this inventory and to properly account for it on its balance sheets was not inadvertent. Long before Jaco induced Plaintiffs to purchase Jaco-Nexus, Defendants were aware of that the value of Jaco-Nexus' inventory was seriously overstated. Indeed, Dan Shea the president of Jaco-Nexus, informed his superiors at Jaco that he believed in obsolete and unsaleable inventory was being improperly carried on Jaco-Nexus' balance sheet and should be written off. Moreover, Plaintiffs affirmatively represented that they had implemented a sophisticated "inventory control, production and accounting system" as early as 2000. According to Defendants, this system "allow[ed] Nexus to maintain a single internal inventory master list that provides cross links to multiple manufacturers and customers [sic] part numbers." Ex. 2, Management Presentation at 38.

13. Jaco ignored both the advice of Jaco-Nexus's president and the information from its inventory management system. The reason for this inaction is obvious. Jaco-Nexus had continuously been on the market for several years, and Jaco had entered into active negotiations with several potential purchasers in the years leading up to Plaintiffs' purchase. Any write-off of inventory would require a restatement of Jaco-Nexus' earnings and would have reduced Jaco-Nexus' price.

14. Defendants' conduct went well beyond simply failing to take the proper charge offs, however. Prior to and at the closing, Defendants also made direct and specific representations regarding the value of Jaco-Nexus' assets, including the largest component of those assets – its inventory. In the Asset Purchase Agreement, Defendants represented that

> All of the Seller Financial Statements are accurate and complete in all Material respects. The Seller Financial Statements in clauses (i) and (ii) above present fairly the financial position of the Seller [Jaco-Nexus] as of the respective dates thereof and the results of operation for the periods covered thereby. The Seller Financial Statements in clauses (i) and (ii) above have been prepared in

accordance with GAAP, applied on a consistent basis throughout the periods covered, except for the absence of footnotes.

Ex.1, Asset Purchase Agreement ¶ 3.4(b). Included in the financial statements referenced above, were specific representations regarding the value of Jaco-Nexus' inventory. Schedule 3.4, attached to the Asset Purchase Agreement represents that the value of Jaco-Nexus' inventory as of June 30, 2004 was $7,923,578. Plaintiffs reported this same value in the Management Presentation it prepared for Comerica Bank. Ex. 2 at 51.

15. Defendants also represented in the Asset Purchase Agreement that the valuation of the inventory was accurate:

> The inventory is valued on the books and records of the Seller and in the Seller Financial Statements at the lower of cost or market. All inventory is accounted for using the average cost in accordance with GAAP.

Ex. 1, Asset Purchase Agreement ¶ 3.7 (emphasis added). This representation was false. The obsolete inventory had no market value.

16. After the closing, Plaintiffs began the work necessary to register the stock of Nexus Nano with the Securities and Exchange Commission. Subsequent to the purchase, Plaintiff were required to prepare audited financial statements for the period from July 1, 2004 through October 3, 2004 and the years ended June 30, 2004 and 2003. During that process, Plaintiffs realized that Jaco had included in its inventory valuation customized component parts that it purchased in connection with customer orders that were subsequently replaced or cancelled prior to July 1, 2002. This inventory could neither be used for new orders nor returned to vendors for credit. The value that Jaco had assigned to these materials that it knew to be worthless as early as 2002, was approximately $2,000,000.

17. Discovery of this large amount of worthless inventory resulted in Plaintiffs writing off a significant portion of the "assets" they had purchased from Defendants. The

consequences of this write off were significant and damaging. First, under the credit agreement between Plaintiffs and Comerica, Plaintiffs were required to meet four covenants: (1) minimum working capital; (2) minimum debt service ratio (calculated by dividing EBITDA by total interest and principal payment requirements); (3) leverage ratio (i.e., the ratio of liabilities to tangible net worth); and (4) minimum tangible net worth. As a result of having to write off some 20% of its inventory, Plaintiffs financial condition did not comply with these covenants and Plaintiffs found themselves in default under the Comerica credit agreement. In response, Comerica declared a default on the term loan and restricted Plaintiffs access to a revolving credit facility established in connection with Plaintiffs' purchase of Jaco-Nexus, and that had been intended to support operations. This restriction has had the negative effect of reducing Plaintiffs working capital such that it has been unable to purchase needed materials and equipment, and has resulted in eroding sales and contracting receivables. Because these receivable are a component of the collateral that Comerica reviews in determining whether and to what extent Plaintiffs have access to the revolving credit facility, the amount of credit available to Plaintiffs in the months since finding themselves in default has dropped by $1.1 million.

18. Defendants' misrepresentations and the default, which arises exclusively from Defendants' fraudulent and negligent misrepresentations, has had multiple negative consequences.

19. First, because of Defendants' misrepresentations, the negotiated price that Plaintiffs paid for Jaco-Nexus was inflated. Under GAAP, a charge against assets – in this case, inventory – results in a dollar for dollar reduction in earnings. Had the full $2 million charge off been recorded in 2004, the result would have been to reduce Jaco-Nexus EBITDA to $376,638. If the purchase price calculation of 6 times EBITDA were applied to this figure, then the sale

price for Jaco-Nexus drops from $12 million to a mere $2.25 million. It indicates that had Plaintiffs been provided with the true financial condition of Jaco-Nexus, a very different formula for the sale price would have been reached, and that Plaintiffs agreed to pay $12 million only because of Defendants' fraudulent misrepresentations and omissions.[1]

20.     Second, even under the simplest and most straightforward analysis, Plaintiffs received $2 million less value than they were promised and have been directly injured in at least that amount.

21.     Third, because the discovery of the inflated inventory values put Plaintiffs in default on their financing agreements with Comerica, Plaintiffs suffered additional, direct, financial harm. Because of the default, Comerica restricted Plaintiffs access to a critical revolving credit facility. As a result, Plaintiffs lacked funds to properly support its marketing and manufacturing efforts. This has resulted in a loss of sales and a reduction in Plaintiffs ability to effectively compete in a very competitive market. The default jeopardized Plaintiffs' credit, and made it difficult to purchase necessary goods and services on favorable terms. The loss of the revolving credit facility has further exacerbated Plaintiffs' condition, forcing Plaintiffs to pay vendors more slowly, necessarily waiting on payment from their own customers, thus further straining relations between Plaintiffs and their business partners.

22.     Fourth, Plaintiffs' ability to capitalize Nexus through registration and successful offering of its stock has been compromised. Plaintiffs have been forced to disclose the existence of the default caused by Defendants' misrepresentations, and to present a cautious picture of

---

[1] A similar result applies had Jaco properly recorded its losses in the years in which they occurred. Those losses would have reduced Nexus-Jaco's historical earnings and presented a true picture of its spotty track record, resulting in a much different negotiation.

Plaintiffs prospects as a going concern. These disclosures have had, and will continue to have, a negative effect on Plaintiffs ability to sell its stock.

## COUNT I – FRAUD

23. Paragraphs 1 – 22, inclusive, are hereby incorporated herein by reference.

24. Defendants Jaco and Jaco-Nexus misrepresented to Plaintiffs the projected and actual EBITDA and inventory value of Jaco-Nexus orally and in writing during negotiations for the sale and purchase of Jaco-Nexus and at the closing of that sale.

25. Defendant's misrepresentations were material and resulted in an overstatement of the value of Jaco-Nexus' assets by $2 million dollars. This misrepresentation resulted in the negotiation of an inflated purchase price substantially in excess of the real value of Jaco-Nexus.

26. Defendants knew that their representations regarding the value of Jaco-Nexus was incorrect, and specifically that they had materially misrepresented the value of Jaco-Nexus' inventory.

27. Plaintiffs justifiably believed Plaintiffs' misrepresentations, and were justified in acting on them.

28. Plaintiffs were damaged as a result of Defendant's fraud, including at least out-of-pocket damages, lost profits, and lost business opportunities.

## COUNT II – NEGLIGENT MISREPRESENTATION

29. Paragraphs 1 – 28, inclusive, are hereby incorporated herein by reference.

30. Defendants knew or should have known that the value of Jaco-Nexus, and in particular that the value of Jaco-Nexus inventory was materially less than they represented it to be.

31. Defendants knew that Plaintiffs would and rely on that information for the purpose of determining whether to enter into the Asset Purchase Agreement. Moreover, Defendants presentation to Comerica Bank establishes that Plaintiffs were relying on Defendants misrepresentations in deciding to enter into the Asset Purchase Agreement, and were relying on that information in committing themselves to indebtedness in order to purchase Jaco-Nexus.

32. Plaintiff reasonably relied on Defendant's misrepresentations, and suffered damages including at least out-of-pocket damages, lost profits, and lost business opportunities.

## COUNT III – EXEMPLARY DAMAGES

33. Paragraphs 1 – 32, inclusive, are hereby incorporated herein by reference

34. Because Defendants misrepresentations were knowing and intentional, Plaintiffs are entitled to exemplary damages in an amount to be determined by the Court.

## PRAYER FOR RELIEF

WHEREFORE Plaintiffs pray for entry of a judgment from this court awarding:

   a. Actual and consequential damages, including out of pocket damages, lost profits, and lost business opportunities in an amount to be determined by the court;

   b. Punitive damages;

   c. Attorney's fees and costs as permitted by law;

   d. Pre-judgment interest at the maximum rate permitted by law;

   e. Such other and further relief as this Court may deem just and proper.

Dated: September 1, 2006.

Respectfully submitted,

Sanford P. Rosen & Associates, P.C.

By: _____
Sanford P. Rosen (SR4966)

747 Third Avenue
New York, NY 10017-2803
(212) 223-1100 Telephone
(212) 223-11002 Fax

and

Paul J. Dobrowski
State Bar No. 05927100
C. Gerard Harrison
State Bar No. 60787651
1010 Lamar, Suite 1350
Houston, Texas 77002
(713) 659-2900 Telephone
(713) 659-2908 Fax

ATTORNEYS FOR PLAINTIFFS